IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBIN HAGAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1365 |
| | § | |
| ECHOSTAR SATELLITE L.L.C. | § | |
| and ECHOSPHERE L.L.C., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER
GRANTING JUDGMENT AS A MATTER OF LAW

Pending is Defendants' Motion for Judgment as a Matter of Law
(Document No. 82), made by Defendants Echostar Satellite L.L.C. and
Echosphere L.L.C. (collectively "Echostar") pursuant to Fed. R.
Civ. P. 50(a), at the conclusion of Plaintiff Robin Hagan's
("Plaintiff" or "Hagan") evidence in the jury trial conducted by
the Court February 5-8, 2007.  Defendants made their motion after
Plaintiff rested his case, and the Court reserved ruling on the
motion.  Before submission of the case to the Jury, Defendants
renewed their motion and again the Court reserved ruling.  The
Jury, after one and one-half days of deliberation, was unable to
agree upon a verdict, and the Court declared a mistrial.
Accordingly, no judgment was entered, and the Court advised the
parties that it would rule on the pending motion for judgment as a
matter of law, upon which it had reserved ruling.  Plaintiff has

now filed his response in opposition and, in the alternative, his own Motion for Judgment as a Matter of Law (Document No. 95).

Under Federal Rule of Civil Procedure 50(a), judgment as a matter of law should be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a jury to find for a party." Fed. R. Civ. P. 50(a). Thus, a motion for judgment as a matter of law "is appropriate if, after considering the evidence presented and viewing all reasonable inferences in the light most favorable to the nonmovant, the facts and inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict." Murray v. Red Kap Indus., Inc., 124 F.3d 695, 697 (5th Cir. 1997). Contrariwise, "if reasonable persons could differ in their interpretations of the evidence, then the motion should be denied." Thomas v. Tex. Dep't of Criminal Justice, 220 F.3d 389, 392 (5th Cir. 2000)(citing Baltazar v. Holmes, 162 F.3d 368, 373 (5th Cir. 1998)). "In other words, [the Court] must give credence to the evidence supporting the nonmovant as well as any evidence supporting the moving party that is uncontradicted, unimpeached, and not attributable to interested witnesses." Phillips ex rel. Phillips v. Monroe County, 311 F.3d 369, 373 (5th Cir. 2002)(citing Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2110 (2000)).

The evidence viewed in the light most favorable to Plaintiff is that Hagan had been employed at Echostar for approximately 4-1/2 years when his employment was terminated by the company on January 11, 2005.  During most of this time he was a technician who installed satellite dishes for customers of Echostar.  In March, 2004, however, he was promoted to the position of a field service manager and became responsible for supervising a group of satellite dish technicians.  His training to act as a field service manager continued after he assumed his new responsibilities.  In late 2004 and up to the date of his discharge, Plaintiff as a field service manager reported to Trina Robinson, an installation manager, who, in turn, reported to Patrick Morrow, who was the general manager.

General Manager Patrick Morrow conducted a managers' meeting in December, 2004, at which he informed the managers that the company planned to roll out soon a new work schedule for the technicians.  The existing schedule required the technicians to work in one of two 4-day shifts, either from Sunday through Wednesday, or from Wednesday through Saturday.  Each two-week pay period included eight 10-hour work days but because the technicians ordinarily worked longer than 10 hours, they were accustomed to accruing significant numbers of overtime hours.  In fact, the overtime hours in each two-week pay period were often the equivalent of one full work day.  There was also the anomaly of both shifts working on Wednesdays, which meant that there were two

technicians on a truck on Wednesdays whereas normally only one technician was assigned to each truck.

The new work schedule announced in December to Plaintiff and the other field service managers would require technicians to work a rotating two-week schedule that included seven 12-hour work days, with a mandatory 30 minute break each day, arranged in alternating four-day and three-day shifts each week. Thus, in the first week a technician assigned to work four 12-hour days, Sunday through Wednesday, would be assigned to work three 12-hour work days the second week, Sunday through Tuesday. The counterpart shifts would work Thursday through Saturday the first week and then Wednesday through Saturday the second week. Management's stated objective with the new schedule was to eliminate the inefficiencies created by the Wednesday overlap and improve customer service. Plaintiff immediately voiced his concern that the new schedule would not be well received by the technicians and, based on his prior experience as a technician, he anticipated that the loss of one work day each pay period would result in a reduction of overtime hours worked and a corresponding drop in the technicians' pay.

The field service managers were instructed not to mention anything about the new schedule change until it was officially announced. Echostar officials also instructed the field service managers that when the announcement was made they were to present the new shift schedule to the technicians as an effort to eliminate

4

the inefficiencies created by the Wednesday overlap and to explain
that it was not designed to reduce the number of overtime hours.
In fact, there were 8 hours of overtime built into alternate weeks
when the technicians were required to work four 12-hour days.
Additionally, Echostar told its field service managers to emphasize
how the schedule would permit the technicians to have an extra day
off during each pay period.   On Wednesday, January 5, 2005,
Echostar held an all-team meeting, attended by the technicians, and
General Manager Morrow announced the new schedule for shifts.
After taking two or three questions from the technicians, Morrow
requested that the technicians talk with their respective field
service managers who would answer any further questions.

    Late that day at least some of Hagan's technicians asked him
if the new schedule would cut into their overtime, and Hagan
replied that it would.   At least one of the technicians asked Hagan
if the schedule change was legal.   Hagan could not remember how
that question was worded, but believed the inquiry was whether the
company could lawfully increase each work day from 10 to 12 hours,
with only a 30-minute mandatory break.   Plaintiff did not know the
answer to the question and therefore asked the Human Resources
Manager, Eric Love ("Love"), to speak with the technicians.
Plaintiff had previously consulted Love when Human Resources issues
arose that Plaintiff, a first-year field service manager, was
unable to answer.   On this occasion, Hagan asked Love to answer the

technicians' questions himself.  Love met with some technicians who reported to Plaintiff, but Plaintiff, who was talking with another technician at the time, did not hear what Love said.  Afterwards, however, Plaintiff observed that the technicians seemed satisfied.

Plaintiff acknowledged that part of his responsibilities as a field service manager included calculating overtime hours earned by his technicians and, while he had had no special training in how to answer questions about overtime hours, he knew and had told his technicians that they could not depend on the availability of overtime hours.  Moreover, Plaintiff knew that no employee had a right under the law to work overtime hours and, in his experience, Plaintiff found that Echostar had always paid its technicians for the overtime hours that they did work.  For his own part, Plaintiff concedes that he did not question whether the shift schedule change was illegal because he believed that Echostar would not do anything illegal.  The technicians reporting to Plaintiff did not express any legal concerns to him about the new schedule except on the day of the announcement, January 5, 2005, when he solicited Love to respond for him.

At a regularly scheduled meeting with his technicians held four days later, on January 9, one or more technicians again asked Plaintiff if the schedule change would cut into their overtime. Plaintiff responded in the affirmative, but stressed that the purpose for the change was to maximize efficiency by eliminating

6

the overlap in the shifts and the double staffing of vans on Wednesdays.   Two days later, on January 11, Morrow called Hagan into the office and informed him that he was being terminated, effective immediately, for lack of work performance.  Love, who was also present, commented that Plaintiff should not have brought his technicians to speak with him on Wednesday, but instead should have deferred responding to their questions, asked Love for the answers, and then conveyed the answers to the technicians himself. Moreover, Plaintiff was told that he should not have mentioned the impact of the schedule on the technicians' overtime hours, which Echostar later cited as an act of insubordination.[1]

---

[1] Plaintiff called as adverse witnesses the key persons who had had a role in the decision to discharge Hagan and through them Echostar's stated non-discriminatory reasons for its discharge decision were presented.   In mid-November, 2004, Echostar had placed Plaintiff on a performance coaching plan due to his inadequate performance as a field service manager.  This plan set out numerous specific requirements for his improvement and expressly warned that a failure to meet expectations will result in disciplinary action up to and including termination.  Approximately seven weeks later and prior to Hagan's termination, his supervisor Trina Robinson reported to Patrick Morrow that Hagan had "struggle[d] to try and keep up but, as long as he has been an [sic] FSM he should not be experiencing the problems that he is having."  When told that a reduction in force required her to reduce the number of her field service managers from six to three, Robinson recommended sending two managers back to the field as technicians and discharging Hagan, who had the lowest annual performance evaluation score of all six managers who reported to her.  She advised against sending Hagan back to the field as a technician because "I don't think we could stand any extra negativity in the field at this time."  Echostar had additional complaints about what it regarded as Hagan's inept and even insubordinate handling of the shift schedule change with his technicians, and a considerable list of complaints about his overall performance as a manager.  Although Echostar's evidence of

In this case, Plaintiff Hagan accuses Echostar of discharging him in violation of Section 215(a)(3) of the Fair Labor Standards Act, which prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has *filed any complaint* or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3) (emphasis added).  This is the statutory protection provided for an employee's "protected activity" under the FLSA.

An action under Section 215(a)(3) is subject to the burden-shifting framework of <u>McDonnell-Douglas Corp. v. Green</u>, 93 S. Ct. 1817, 1824 (1973).  *See* <u>Kanida v. Gulf Coast Med. Pers. L.P.</u>, 363 F.3d 568, 577 (5th Cir. 2004).  First, a plaintiff must make a *prima facie* showing of (1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action.  *See* <u>Holt v. JTM Indus., Inc.</u>, 89 F.3d 1224, 1225-26 (5th Cir. 1995)(articulating this standard in an ADEA retaliation case); <u>Conner v. Celanese, Ltd.</u>, 428 F. Supp. 2d 628, 638 (S.D. Tex. 2006)(Rainey, J.)(applying the standard to the FLSA).  If a plaintiff meets this

---

legitimate, non-discriminatory reasons for its discharge of Hagan would have bearing in the burden-shifting analysis if Hagan could make a prima facie case of retaliation, it has no bearing and is not considered in the present analysis of whether Hagan presented any evidence more than a scintilla that he engaged in protected activity under the FLSA.

burden, the defendant must then articulate a legitimate, non-discriminatory reason for its decision.  *See* <u>Conner</u>, 428 F. Supp. 2d at 638.  The burden then shifts to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination.  <u>Id.</u>

This Court has followed the majority position that an employee's informal complaint to his employer may constitute protected activity under Section 215(a)(3).  *See* <u>Dearmon v. Tex. Migrant Council, Inc.</u>, 252 F. Supp. 2d 367, 367-68 (S.D. Tex. 2003) (Kazen, J.); <u>Truex v. Hearst Commc'ns, Inc.</u>, 96 F. Supp. 2d 652, 665-66 (S.D. Tex. 2000) (Rosenthal, J.); *see also, e.g.*, <u>Lambert v. Ackerley</u>, 180 F.3d 997, 1003-05 (9th Cir. 1999)(en banc); <u>Valerio v. Putnam Assocs., Inc.</u>, 173 F.3d 35, 44-45 (1st Cir. 1999); <u>EEOC v. Romeo Comty. Schs.</u>, 976 F.2d 985, 989-90 (6th Cir. 1992); <u>EEOC v. White & Son Enters.</u>, 881 F.2d 1006, 1011 (11th Cir. 1989); <u>Brock v. Richardson</u>, 812 F.2d 121, 124-25 (3d Cir. 1987); <u>Love v. Re'Max of Am., Inc.</u>, 738 F.2d 383, 387 (10th Cir. 1984); <u>Brennan v. Maxey's Yamaha, Inc.</u>, 513 F.2d 179, 181 (8th Cir. 1975).  *But see* <u>Lambert v. Genesee Hosp.</u>, 10 F.3d 46, 55 (2d Cir. 1993)(requiring the filing of a formal complaint with a government agency).  At the same time, however, not all "abstract grumblings" or vague expressions of discontent are actionable as complaints.  <u>Lambert</u>, 180 F.3d at 1007; <u>Valerio</u>, 173 F.3d at 44.

The threshold question is whether the evidence, viewed in the light most favorable to Plaintiff, is sufficient to present a

question for the jury on whether Plaintiff, a field service manager
charged by Echostar to represent the company in interfacing with
the non-exempt technicians that he supervised regarding a shift
schedule change that arguably could affect the numbers of overtime
hours accrued by the technicians, made a complaint of any sort to
his employer within the meaning of Section 215(a)(3).  In other
words, is there any evidence that Plaintiff himself engaged in
protected activity within the ambit of Section 215(a)(3), which is
the essential first element required to be proved to establish a
prima facie case?  Moreover, and assuming without deciding that the
technician(s) who asked their field service manager Hagan about the
legality of the schedule change and its impact on overtime hours
did themselves engage in protected activity (and could not have
been discharged for having asserted their supposed rights under the
FLSA), is there any evidence that Plaintiff Hagan stepped out of
his role as an Echostar field service manager, either to complain
to his employer in behalf of the technicians, or in his own behalf,
about a supposed violation or irregularity under or related to the
FLSA?

        It has been held that the "hallmark of protected activity"
under Section 215(a)(3) "is the assertion of statutory rights,
*i.e.*, the *advocacy* of rights, by taking some action adverse to the
company--whether via formal complaint, providing testimony in an
FLSA proceeding, complaining to superiors about inadequate pay, or

otherwise." McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996) (emphasis in original). "[T]he employee must take some actions which a reasonable employer would consider an assertion that employees are entitled to the overtime pay or other benefits conferred by the FLSA." York v. City of Wichita Falls, 944 F.2d 236, 241 (5th Cir. 1991); *see also* Garcia-Paz v. Swift Textiles, Inc., 873 F. Supp. 547, 560 (D. Kan. 1995) ("The relevant question . . . is . . . whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful . . . manner."). Accordingly, a manager complainant must "step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA." McKenzie, 94 F.3d at 1486-87 (held, personnel director did not engage in a protected activity by reporting overtime violations because her job responsibilities included "wage and hour issues"); *accord* Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004) (held, employee did not engage in protected activities by writing letter to his employer stating that security guards were not properly compensated for overtime hours worked, and his later refusal to sign the invoices, because it was his job to monitor the

11

guards and approve their invoices for payment, and he therefore did not "cross[] the line from being an employee merely performing his job to an employee lodging a personal complaint").

The evidence received at trial viewed in the light most favorable to Plaintiff is that Plaintiff as a field service manager was made privy to the new shift schedule and the stated reasons for such the month before it was presented to the non-exempt technicians; that Plaintiff immediately voiced his belief based on his prior years' experience as a technician that the technicians would not like the new schedule because it was likely to reduce their overtime hours; that before the change was announced, Plaintiff along with other field service managers were instructed on how they should interpret to their respective groups of technicians the underlying purposes of the schedule change, its advantages both for the company in efficiency and customer service by eliminating the double staffing of vans on Wednesdays, and for the technicians who would receive an extra day off during each pay period, and to explain that it was not about overtime hours; that when the new shift schedule was announced to the technicians on January 5, the general manager requested that the technicians then take up any questions they had with their own field service managers; and that Plaintiff Hagan, when he felt that he did not know the answer(s) to some questions regarding the legality of the schedule change, sought help from the Human Resources Manager by

asking him to answer the technicians' questions.  There is no evidence that Plaintiff at any point crossed the line from acting in his appointed capacity as a field service manager in behalf of the company to acting in an adversarial role against Echostar. Moreover, there is no evidence that Plaintiff's request of Love, viewed in the light most favorable to Plaintiff, constituted an act adverse to Echostar's interest.  Moreover, there is no evidence of conduct by Hagan that reasonably could or should have been construed or understood by the employer as a positive assertion of rights against Echostar under or related to the FLSA either in Plaintiff's behalf or in behalf of the technicians.  The evidence is uncontroverted that Plaintiff as a field service manager sought help to compensate for his own perceived sense of inability correctly to answer questions in behalf of Echostar, and at no time in his encounter with Love did Plaintiff say or do anything that would constitute even an informal complaint by Plaintiff against his employer or a departure from his duties as a field service manager representing the company over to a role as an advocate for the technicians voicing a complaint to the company.

One further factor may be considered in determining whether Plaintiff engaged in protected activity, namely, whether there is any evidence that Plaintiff had a good faith belief that the conduct complained of violated the FLSA.  *See* Sapperstein v. Hager, 188 F.3d 852, 857 (7th Cir. 1999); Love v. Re/Max of Am., Inc., 738

13

F.2d 383, 387 (10th Cir. 1984) ("[Section 215(a)(3)] protects conduct based on a good faith, although unproven, belief that the employer's conduct is illegal."); <u>Burnette v. Northside Hosp.</u>, 342 F. Supp. 2d 1128, 1133-35 (N.D. Ga. 2004)(discussing and applying both a subjective and an objective standard of good faith); <u>Tjelle-Monferdini v. Caterpillar, Inc.</u>, No. 04-C-1689, 2004 WL 2533781, at *6 (N.D. Ill. Sept. 28, 2004)(citing <u>Sapperstein</u> for the good faith requirement); <u>Malone v. Signal Processing Techs., Inc.</u>, 826 F. Supp. 370, 376-77 (D. Colo. 1993), *abrogated on other grounds by* <u>Landgraf v. USI Film Prods.</u>, 114 S. Ct. 1483 (1994). The uncontroverted evidence is that Plaintiff had no such belief. Plaintiff admitted that he knew that the FLSA does not guarantee any employee a right to work overtime hours and that he had cautioned his technicians not to count on overtime hours. He freely acknowledged that Echostar had always paid employees for the overtime hours that they worked. In addition, Plaintiff admitted that he himself did not believe the schedule change was illegal in any way. There is simply no evidence that Plaintiff had any good faith belief that the new shift schedule implemented by Echostar constituted a violation of the FLSA; and the most that the evidence shows is that Plaintiff, as a field service manager with less than one year's experience on the job, felt inadequate to answer some of the specific legal questions about the change, which prompted him

to seek help from--but not to complain to--the Human Resources Manager Love.

In sum, Plaintiff after having been fully heard and having rested his case, presented no evidence sufficient to raise a question for the jury on an essential element of his prima facie case, namely, whether he engaged in protected activity within the meaning of Section 215(a)(3).  His retaliation claim therefore fails as a matter of law.  For the foregoing reasons, it is

ORDERED that Defendants' Motion for Judgment as a Matter of Law (Document No. 82) is GRANTED, Plaintiff's Motion for Judgment as a Matter of Law (Document No. 95) is DENIED, and judgment will be entered as a matter of law that Plaintiff Robin Hagan take nothing on his claims and this case will be DISMISSED WITH PREJUDICE.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, this 16th day of February, 2007.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE


15